## ANHEUSER-BUSCH BREWING ASSOCIATION *v.* THE UNITED STATES.

### APPEAL FROM THE COURT OF CLAIMS.

No. 60.　Argued December 9, 1907.—Decided January 6, 1908.

To entitle a manufacturer to drawbacks under § 25 of the Tariff Act of October 1, 1890, 26 Stat. 567, 617, on imported raw material used in the manufacture or production of articles in the United States, there must be some transformation, so that a new and different article emerges having a distinctive name, character and use. The mere subjection of imported articles, such as corks, to a cleansing and coating process to adapt them to a special use does not amount to manufacturing them within the meaning of the statute, and the exporter is not entitled to drawback thereon. *Jos. Schlitz Brewing Co.* v. *United States,* 181 U. S. 584. *Semble:* an exportation of bottled beer is an exportation of the beer and not of the corks in the bottles, and therefore such corks are not exported articles within the meaning of § 25 of the Tariff Act of October 1, 1890.

41 C. Cl. 389, affirmed.

THE facts are stated in the opinion.

*Mr. L. T. Michener,* with whom *Mr. W. W. Dudley* was on the brief, for appellant:

This court has sanctioned the use of dictionary definitions

in determining the meaning of words in tariff laws. *Marvel v. Merritt,* 116 U. S. 11, 12; *Nix* v. *Hedden,* 149 U. S. 304.

The definitions of the word "manufacture" found in various standard dictionaries plainly bring the processes to which these corks were subjected within the meaning of the word as ordinarily used. Brande's Ency., tit. "Manufacture;" *Evening Journal Assn.* v. *State Board of Assessors,* 47 N. J. Law (18 Vroom), 36, 38. "Manufacture" is defined by Worcester to be "the process of making anything by art, or of reducing materials into forms fit for use by hand or by machinery, as an establishment for the manufacture of cloth; anything made or manufactured by hand, or manual dexterity, or by machinery." As a verb it is defined to mean, to form by manufacture or workmanship by hand or by machinery; to make by art or labor. Approved and applied in *Attorney General* v. *Lorman,* 59 Michigan, 157; *Louisville & N. R. Co.* v. *Fulghan,* 91 Alabama, 555; *Beggs* v. *Edison Elec. Ill. Co.,* 96 Alabama, 295; *Lamborn* v. *Bell,* 18 Colorado, 346. See also *Murphy* v. *Arnson,* 96 U. S. 131, 134; *Carlin* v. *Western Assurance Co.,* 57 Maryland, 515, 526; *S. C.,* 40 Am. Rep. 440; *Norris* v. *Commonwealth,* 27 Pa. St. (3 Casey) 494, 496; *Landgraf* v. *Kuh,* 188 Illinois, 484.

A "manufacturer" is defined to be one who is engaged in the business of working raw materials into wares suitable for use; who gives new shapes, new qualities, new combinations, to matter which has already gone through some artificial process. A manufacturer prepares the original substance for use in different forms.

He makes to sell, and stands between the original producer and the dealer and first consumer, depending for his profit on the labor which he bestows on the raw materials. *State* v. *Dupre,* 42 La. Ann. 561; *City of New Orleans* v. *La Blanc,* 34 La. Ann. 596, 597; *City of New Orleans* v. *Ernst,* 35 La. Ann. 746, 747; *State* v. *American Sugar Refining Co.,* 108 Louisiana, 603.

The things done to, by and with the corks were a manu-

facture of corks within the acts of Congress; the corks were imported materials used in the manufacture of articles in the United States, on which duties had been paid, and then were exported to foreign countries; and the appellant is a manufacturer and exporter within those acts of Congress and is entitled to a refund of the duties so paid. *Schriefer v. Wood*, 21 Fed. Cas. 737; *Commonwealth v. Juniata Coke Co.*, 157 Pa. St. 507; *Burke v. Mead*, 64 N. E. Rep. 880, 883; *S. C.*, 159 Indiana, 252; *People v. Wemple*, 129 N. Y. 543; *People v. Morgan*, 63 N. Y. Supp. 76, 79; *Nassau Gas Co. v. Brooklyn*, 89 N. Y. 409; *Attorney General v. Lorman*, 59 Michigan, 157; *S. C.*, 60 Am. Rep. 287; *Southern Chem. Co. v. Board of Assessors*, 48 La. Ann. 1475; *Louisville & N. Railroad Co. v. Fulgham*, 91 Alabama, 555; *Engle v. Sohn*, 41 Ohio St. 691. *Hartranft v. Wiegmann*, 121 U. S. 609, and *Schlitz Brewing Co. v. United States*, discussed and distinguished.

*Mr. Assistant Attorney General Van Orsdel* for appellee:

The corks in question were not a part or ingredient of the beer exported, and were not, therefore, in contemplation of law, exported at all. *Schlitz Brewing Co. v. United States*, 181 U. S. 584.

The process of cleansing and preparation adopted and applied by the appellant to the corks in question did not constitute a manufacture of corks within the purview of the statute providing for a rebate or drawback on exported manufactured articles. *Frazee v. Moffitt*, 20 Blatchf. 267; *United States v. Potts*, 5 Cranch, 284; *Tidewater Oil Co. v. United States*, 171 U. S. 210.

MR. JUSTICE McKENNA delivered the opinion of the court.

This is an action for $27,000 for drawbacks on corks imported from Spain and used by claimant in bottling its beer, and entered for the benefit of drawback upon exportation under § 25 of the act of Congress, entitled "An act to reduce the revenue and equalize duties on imports and for other purposes,"

approved October 1, 1890.  26 Stat. 567, 617.  The section reads as follows:

"That where imported materials on which duties have been paid, are used in the manufacture of articles manufactured or produced in the United States, there shall be allowed on the exportation of such articles a drawback equal in amount to the duties paid on the materials used, less one per centum of such duties.  *Provided,* That when the articles exported are made in part from domestic materials, the imported materials, or the parts of the articles made from such materials shall so appear in the completed articles that the quantity or measure thereof may be ascertained.  *And provided further,* That the drawback on any article allowed under existing law shall be continued at the rate herein provided.  That the imported materials used in the manufacture or production of articles entitled to drawback of custom duties when exported shall in all cases where drawback of duties paid on such material is claimed, be identified, the quantity of such materials used and the amount of duties paid thereon shall be ascertained, the facts of the manufacture or production of such articles in the United States and their exportation therefrom shall be determined, and the drawback due thereon shall be paid to the manufacturer, producer, or exporter, to the agent of either or to the person to whom such manufacturer, producer, exporter or agent shall in writing order such drawback paid, under such regulations as the Secretary of the Treasury shall prescribe."

The corks in question were, after their importation, subjected to a special treatment, which, it is contended, caused them to be articles manufactured in the United States of "imported materials" within the meaning of § 25.  The Court of Claims decided against the contention and dismissed the petition.  41 C. Cl. 389.

The treatment to which the corks were subjected is detailed in finding III, inserted in the margin.[1]

[1] III. That while said acts of October 1, 1890, August 28, 1894, and July 24, 1897, were in force and operation the claimant herein, being en-

In opposition to the judgment of the Court of Claims coun-
sel have submitted many definitions of "manufacture," both

---

gaged in the regular, ordinary and usual course of its business aforesaid,
exported from the United States a large quantity of beer brewed and manu-
factured by it, which exportation thereof was in bottles duly corked by it
with corks so as to preserve the beer; that such corks so used by it in the
bottles in which such beer was exported were imported from Spain, a foreign
country (and on which corks duty had been paid to the United States,
according to law, at the rate of 15 cents per pound, under the provisions
of paragraph 416 of the act of Congress approved July 24, 1897), they being
corks over three-fourths of an inch in diameter, measured at the larger
end. The corks so imported from Spain were subjected to treatment by
claimant.

The corks so used by the claimant in the making and shipment of its
export beer were corks imported into this country from Spain, where they
were cut by hand, without steaming. After these corks were received by
claimant in its brewery in St. Louis, and while in the same state in which
they were imported from Spain, they were carefully examined and all that
were not fit for use in the export trade were rejected. The good ones were
then selected and assorted according to sizes, and were branded with the
date, the name of the brewer, and the name of the beer, and a special private
mark to show what firm the cork came from. All this was done by unskilled
labor.

The selected corks were put into a machine, or air fan, the unpatented
invention of a man in the employ of the claimant, and all dust, meal, bugs,
and worms were removed therefrom. They were then thoroughly cleansed
by washing and steaming, removing the tannin and germs and making
the cork soft and elastic, and they were next exposed to blasts of air in a
machine, the unpatented invention of the same employé, until they were
absolutely dry.

Following this, they were put for a few seconds into a bath of glycerine
and alcohol, the proportions of which are a trade secret which the claimant
has the right to use, and then they were dried by a special system. This
bath closed up all the seams, holes and crevices, and gave the corks a coat-
ing which prevented the beer from acquiring a cork taste. The corks were
then dried by absorption of the chemicals that had covered them. If the
corks had been used without the application of this chemical bath, the beer
would have acquired a taste of cork which would have injured the market
for it.

The whole process took from one day to three days, the longest part of
it being the drying after the chemical bath.

The bath made it easier to put the cork into the bottle and take it out.
The pores and apertures of the cork were thoroughly closed by the bath,
and thus the escape of the gases contained in the beer was prevented.

The steaming of the corks, or pasteurizing them, destroyed all the germs

ANHEUSER–BUSCH ASSN. v. UNITED STATES. 561

as a noun and a verb, which, however applicable to the cases
in which they were used, would be, we think, extended too far

---

in them that would damage or spoil the beer, if they were not pasteurized.
This pasteurizing also destroyed the yeast that might have been in the
beer.

If the corks had but little or no elasticity, and did not fit the bottles
perfectly, the gas would escape while the beer was yet in the brewery, or
in transportation, or in the place of market, and the beer would be flat,
stale, worthless and unmarketable.

When the corks had been dried, they were soft, elastic and pliable, free
from all foreign substances and germs, perfectly airtight, and fitted for
use in bottling beer for export. They were next taken to the building in
claimant's brewery which was used for bottling purposes, where they were
again soaked or wetted by steaming them for a short time, so they would
fit snugly and easily in the bottles.

The bathing, or treatment by the bath, and the washing and steaming
of the corks were all done by skilled labor.

After the beer had been put in the bottles and they had been corked, the
filled bottles were put in a large vat, where they were pasteurized by heat-
ing to the right temperature for a sufficient length of time and cooled again.
If the corks had not been treated as above described, the carbonic-acid
gas would have escaped in the heating or pasteurizing process, because there
was a powerful gas pressure toward the cork during all that process. If
that gas had escaped, the beer would have become flat.

The corks, so treated by this process and put in the bottles of beer, could
only be removed therefrom by means of a corkscrew or other instrument
of force, which removal would damage or destroy the cork so it could not
be used afterwards for the same purpose.

The hand-cut corks which come from Spain have all been cut out of the
wood without steaming it beforehand. The corks that are cut in the United
States are cut from the wood that has been steamed first, thus depriving
them of much of their elasticity. Because the Spanish hand-cut corks are
cut without having been steamed in the first instance, they are far safer
and better corks to be made for and used in bottling export beer than corks
cut in the United States after being steamed.

Without the careful selection and thorough treatment of corks, beer
cannot with safety be exported from the United States to foreign countries.

When the corkwood reaches the United States it is steamed in order to
get an increased volume out of it. The steaming of the corkwood makes it
open something like a sponge. The steaming swells the cork, and those
who do the steaming get more corks out of it, but how much more does not
appear. But the steaming takes away its elasticity, and the cork cut after
steaming is not so good or so perfect as one cut from the dry wood in the
first place.

Corks cut after steaming will shrink, and that fact makes them inferior

if made to cover the treatment detailed in finding III or to the corks after the treatment. The words of the statute are indeed so familiar in use and of meaning that they are confused by attempts at definition. Their first sense as used is fabrication or composition—a new article is produced of which the imported material constitutes an ingredient or part. When we go further than this in explanation we are involved in refinements, and in impracticable niceties. Manufacture implies a change, but every change is not manufacture, and yet every change in an article is the result of treatment, labor and manipulation. But something more is necessary, as set forth and illustrated in *Hartranft* v. *Wiegmann*, 121 U. S. 609. There must be transformation; a new and different article must emerge, "having a distinctive name, character or use." This cannot be said of the corks in question. A cork put through the claimant's process is still a cork. The process is the preparation of the encasement of the beer, and assimilates this case to *Jos. Schlitz Brewing Co.* v. *United States*, 181 U. S. 584. There it was contended that bottles and corks in which beer is bottled and exported were "imported materials used in the manu-

corks. Cork dealers in the United States also put it through various treatments, such as polishing it and using chemicals to make it look bright and have a good color. They do not attempt to close up the pores in the cork, nor run it through machinery to shake or wash the dust or impurities out of it. They put the cork on the market as the machine cuts it after it has been steamed. Corks so cut and treated in the United States would not be fit for use in the exportation of beer, for they would damage the beer through contact, and much stale beer would result from the escape of the carbonic-acid gas by reason of the imperfect corking, and the beer would not be marketable.

In the manufacture of beer for export to other countries it was necessary to destroy the yeast in the beer to prevent second fermentation and the consequent ruin of the beer. In order to destroy the germs of yeast the finished beer was steamed to the degree necessary to destroy the germs, and for that purpose the beer was inclosed securely in a vessel to prevent the escape of the carbonic-acid gas, and of all such vessels a bottle made of glass was and is the one best adapted to the purpose aforesaid. And such steaming was also necessary to the perfect manufacture of beer for bottling, and to the perfect corking thereof it was essential and necessary that the cork as treated should be used as herein described.

facture" of such beer, within the meaning of § 25. And it was pointed out—found by the Court of Claims—that the process of manufacturing beer for exportation was different from the process of manufacturing beer for domestic use and the materials were selected with greater care, in order that the bottled product might preserve purity under the conditions of transportation and change of climate. The process was detailed at length. It was decided, however, that such special process and treatment did not make the bottles and corks component parts of the beer when exported, as it was insisted they were. It is true, that it was not contended in that case, as is in this, that the corks or the bottles were articles manufactured in the United States of imported materials by reason of the special treatment to which they had been subjected, making them better or necessary for their purpose. That such a contention was possible under the statute did not occur to the brewing company. It does not appear in the statement of the case that the corks were subjected to any treatment, and appellant denies the application of the case by saying that "The corks were not put through any process of manufacture whatever." And yet it must have been necessary then, as the Court of Claims has found it to be, that "without the careful selection and thorough treatment of corks beer cannot with safety be exported from the United States to foreign countries." Of course the views of a litigant of his rights under a statute are not an absolute test of the views of a litigant in another case, but the *Schlitz Brewing case* was one which may be supposed to have brought to consideration every practicable and legal problem under the statute, and if a cork by special treatment ceases to be a cork and becomes an article manufactured of cork, the change and the legal effect of it would have thrust themselves upon the notice of somebody. But passing this, there is force in the contention of the United States that the exportations were not of corks or bottles, but of beer; and therefore not articles, exported within the meaning of § 25, entitled to a drawback. This phase of the case—indeed all

phases of it—are ably dealt with in the opinion of the Court of Claims, and it would be unnecessary repetition to go over the argument or to review the cases.

*Judgment affirmed.*