**YURI FASHIONS CO., LTD.,** Plaintiff,

v.

The **UNITED STATES,** Defendant,

and

American **Fiber/Textile/Apparel Coalition,** Defendant-Intervenor.

**Court No. 84–12–01807.**

United States Court of International Trade.

March 24, 1986.

42

Barnes, Richardson & Colburn, Andrew P. Vance and Michael A. Johnson, New York City, for plaintiff.

Donald C. Woodworth, for amicus curiae Com. of the Northern Mariana Islands.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., Washington, D.C. (Velta A. Melnbrencis), New York City, for defendant.

Miller & Chevalier, Chartered, Donald Harrison, Washington, D.C., for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Judge:

Plaintiff challenges the exclusion of sweaters imported from the Commonwealth of Northern Mariana Islands (CNMI) and seeks a declaratory judgment

that a regulation, 19 C.F.R. § 12.130(b) (1985),[1] defining textile products of insular possessions of the United States for purposes of quota restraints, is *ultra vires* and void.

Plaintiff's merchandise was denied entry on the grounds it was not accompanied by export visas from the Republic of Korea (Korea), which the United States Customs Service (Customs) maintained was the country of origin of the merchandise, pursuant to 19 C.F.R. § 12.130(b). Plaintiff says its merchandise is a product of the CNMI for all purposes, pursuant to General Headnote 3(a) of the Tariff Schedules of the United States (TSUS), and cannot be excluded from entry as a product of Korea by virtue of 19 C.F.R. § 12.130(b). Plaintiff also argues that regulation is *ultra vires* as applied to the CNMI.

Plaintiff alleges jurisdiction pursuant to 28 U.S.C. §§ 1581(a)[2] and 1581(i)(3) (1982), and seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 (1982) and Rule 57 of the Rules of this Court.

The American Fiber/Textile/Apparel Coalition, a coalition of twenty-one American trade associations and unions whose members are involved in production of textiles and textile products, was granted leave to intervene as a party defendant in that part of this action brought under 28 U.S.C. § 1581(i).[3] The CNMI, through its Resident Representative to the United States, was granted leave to appear as *amicus curiae*.

Plaintiff moves, and defendant cross-moves, for summary judgment. The parties agree that no issues of material fact are disputed.

The Court holds that 19 C.F.R. § 12.-130(b) does not conflict with General Headnote 3(a).

## I. The Exclusion of Plaintiff's Merchandise

In November, 1984 plaintiff attempted to enter a shipment of sweaters processed in the CNMI from components made in Korea. The merchandise was accompanied by a completed Customs Form 3229, certifying that more than fifty percent of the total value of the merchandise was added by materials made and labor performed in the CNMI. Applying 19 C.F.R. § 12.130, Customs determined that the country of origin of the sweaters was Korea.[4] Since the

---

1. 19 C.F.R. § 12.130 was published as an interim regulation by T.D. 84–171, 49 Fed.Reg. 31248 (August 3, 1984) and as a final regulation by T.D. 85–38, 50 Fed.Reg. 8710 (March 5, 1985). Plaintiff's merchandise was excluded by virtue of the interim regulation. Since plaintiff's merchandise would also be excluded under the final regulation, which differs, with respect to insular possessions, from the interim regulation only in form, the Court considers the final regulation. *See infra*, note 4.

2. Plaintiff protested the exclusion of its merchandise and demanded action on the protest within 30 days pursuant to 19 C.F.R. § 174.21(b) (1984). Plaintiff brought the action under 19 U.S.C. § 1515(b) (1982) and 28 U.S.C. § 1581(a) when no action was taken, and the protest deemed denied, after 30 days.

3. 28 U.S.C. § 2631(j)(1)(A) (1982) provides that Any person who would be adversely affected or aggrieved by a decision in a civil action pending in the Court of International Trade may, by leave of court, intervene in such action, except that—
no person may intervene in a civil action under section 515 ... of the Tariff Act of 1930....

Thus intervention is not permitted where the Court has jurisdiction under 28 U.S.C. § 1581(a) over a cause of action to contest the denial of a protest under 19 U.S.C. § 1515.

4. 19 C.F.R. § 12.130 changed the country of origin requirements for textiles and textile products subject to quantitative restraints. In order for a textile product manufactured in two countries to have the second country as its country of origin for quota purposes, the product must undergo "substantial transformation" in the second country. Section 12.130(b) states in part:
For the purpose of this section ... a textile or textile product, subject to section 204, Agricultural Act of 1956, as amended, imported into the customs territory of the United States, shall be a product of a particular foreign territory or country, or insular possession of the U.S., if it is wholly the growth, product, or manufacture of that foreign territory or country, or insular possession. However ... a textile or textile product, subject to section 204, which consists of materials produced or derived from, or processed in, more than one foreign territory or country, or insular possession of the U.S., shall be a product of that foreign territory or country, or insular posses-

merchandise was not accompanied by export visas from Korea, the merchandise was refused entry.

Plaintiff contends that General Headnote 3(a), TSUS, precludes application of 19 C.F.R. § 12.130 to its merchandise. Plaintiff says that its merchandise is a "product or manufacture" of the CNMI under General Headnote 3(a) for all purposes, and may not have another country as its country of origin for textile restraint purposes unless so provided for by act of Congress. The Court disagrees.

### A. General Headnote 3(a)

■ By its terms, General Headnote 3(a)[5] regulates only the *duty* paid on imports from insular possessions, such as the CNMI. The headnote is captioned "Rates of Duty" and it expressly speaks only to the "rates of duty" for articles imported into the customs territory of the United States.

The Court agrees with the recent holding of the Court of Appeals for the Ninth Circuit that nothing in the headnote addresses quota or other restrictions:

> Headnote 3(a) applies solely to tariffs and duties.... [A]fter examining the common meanings of the words "duty" and "quota," we conclude that "duty" cannot be read to encompass "quota".... Consequently we hold that that

Headnote 3(a) does not apply to quotas, and therefore, that it did not preempt the quota restrictions imposed [on the imported merchandise].

*United States v. Patel*, 762 F.2d 784, 790–91 (9th Cir.1985). Plaintiff says that *Patel*, in which fraudulent violation of import laws was alleged, turned on very different facts than this case, and that the Ninth Circuit apparently overlooked headnote 6 of schedule 7, part 2, subpart E (setting a quota on timepieces imported from insular possessions), when the Court said that it "can find absolutely no reference to quotas in any part" of the TSUS. 762 F.2d at 791. But neither of these observations provide a reason why the *Patel* Court's interpretation of General Headnote 3(a) should not be followed.

The Court also disagrees with plaintiff's argument that the legislative history of General Headnote 3(a) indicates that Congress intended that provision to define the country of origin of merchandise imported from insular possessions for all purposes.

A tariff preference for goods from all insular possessions of the United States was first enacted as part of the Customs Simplification Act of 1954, Pub.L. 768, 68 Stat. 1136, 1139, § 401 (enacted as section 301 of the Tariff Act of 1930), which stated in pertinent part:

> subject to the rates of duty set forth in column numbered 1 of the schedules, except that all such articles the growth or product of any such possession, or manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the customs territory of the United States, or of both, which do not contain foreign materials to the value of more than 50 percent of their total value (or more than 70 percent of their total value with respect to watches and watch movements), coming to the customs territory of the United States directly from any such possession, and all articles previously imported into the customs territory of the United States with payment of all applicable duties and taxes imposed upon or by reason of importation which were shipped from the United States, without remission, refund, or drawback of such duties or taxes, directly to the possession from which they are being returned by direct shipment, *are exempt from duty* [emphasis added].

---

sion where it last underwent a substantial transformation. A textile or textile product will be considered to have undergone a substantial transformation if it has been transformed by means of substantial manufacturing or processing operations into a new and different article of commerce.

*See Mast Industries, Inc. v. Regan*, 8 CIT ——, 596 F.Supp. 1567 (1984) (upholding section 12.130 as within the authority delegated to the President under section 204 of the Agricultural Act of 1956, as amended, 7 U.S.C. § 1854 (1982)).

5. At the time of the attempted entry, in 1984, General Headnote 3(a) provided, in part:

*Rates of Duty*
(a) *Products of Insular Possessions.*
   (i) Except as provided in headnote 6 of schedule 7, part 2, subpart E, and except as provided in headnote 3 of schedule 7, part 7, subpart A, *articles imported from insular possessions of the United States which are outside the customs territory of the United States are*

There shall be levied, collected, and paid upon all articles coming into the United States from any of its insular possessions ... the *rates of duty* which are required to be levied, collected, and paid upon like articles imported from foreign countries; *except that all articles the growth or product of any such possession, or manufactured or produced in any such possession from materials the growth, product, or manufacture of any such possession or of the United States, or of both, which do not contain foreign materials to the value of more than 50 per centum of their total value* ... shall be admitted *free of duty* upon compliance with such regulations as to proof of origin as many be prescribed by the Secretary of the Treasury [emphasis added].

According to its legislative history, this provision was intended to .

provide for the *duty status* of importations from the insular possessions of the United States. The new section would provide that all articles imported from an insular possession of the United States ... shall be dutiable at the same rates as are importations from foreign countries, except those which (1) are entirely of native origin or (2) *are manufactured in such possession and do not contain over 50 percent of foreign materials* ....

S.Rep. No. 2326, 83rd Cong., 2d Sess. (1954) *reprinted in,* 1954 U.S.Code Cong. & Ad. News 3, 3900, 3905 (emphasis added).

General Headnote 3(a) was enacted as part of the Tariff Schedules of the United States in 1962, by the Tariff Classification Act of 1962, Public Law 87–456, 76 Stat. 72. The *Tariff Classification Study* published by the Tariff Commission stated that:

General headnotes 3 and 4 prescribe the conditions obtaining with respect to the "Rates of duty" columns numbered 1 and 2 in the proposed revised schedules.

**6.** *The Tariff Classification Study* is considered an important source of legislative history of the Tariff Schedules. *United States v. Andrew Fisher Cycle Co.,* 57 CCPA 102, 106–07, C.A.D. 986,

In doing so, general headnote 3 covers the substance of the special treatment presently accorded to products of insular possession (under par. 301 of the Tariff Act of 1930, as amended).... 

*Submitting Report,* Vol. 1, p. 17 (emphasis added).[6]

In 1966, Congress considered the tariff status of products of insular possessions in enacting headnotes to Schedule 7 of the TSUS to establish quotas on importation of timepieces and a special country of origin rule for buttons from insular possessions. The legislative history of Pub.L. 89–805, providing for the timepiece quota, states, in part:

Under paragraph (a) of general headnote 3 of the TSUS articles, *the growth or product of a U.S. insular possession* outside the customs territory of the United States, *are free of duty when imported into the U.S. customs territory if they do not contain foreign materials to the value of more than 50 percent of their total value.*

S.Rep. 1679, 89th Cong., 2d Sess. (1966), *reprinted in,* 1966 U.S.Code Cong. & Ad. News 4389, 4390 (emphasis added). The legislative history of Pub.L. 89–806, providing for the country of origin rule for buttons, describes General Headnote 3(a) as providing an "advantage" for goods from insular possessions.

This advantage consists of *duty-free treatment* for articles coming from the insular possessions *if they meet two simple tests.* First, the article arriving from the possession must have a value at least double the value of the foreign materials contained in it. *Second, it must have been subjected to some manufacturing or processing operation in the possession.*

426 F.2d 1308, 1311 (1970); *see* 2 R. Sturm, *Customs Law and Administration,* § 52.2, 10–13 (1985) (citing cases).

S.Rep. 1600, 89th Cong., 2d Sess. (1966), *reprinted in* 1966 U.S.Code Cong. & Ad. News 4398, 4401 (emphasis added).[7]

From the legislative history of General Headnote 3(a), the Court draws two conclusions. First, nothing in the legislative history of General Headnote 3(a) known to the Court indicates that the headnote was intended to regulate anything other than rate of duty. *See Patel, supra.* Second, the legislative history indicates that Congress intended that General Headnote 3(a) grant duty-free treatment to merchandise which (1) is a growth, product or manufacture of an insular possession and (2) satisfies a specified percentage of its value derived from the insular possession. Congress has never specified how merchandise is to be defined as a growth, product or manufacture of an insular possession.[8] Congress presumably left definition of these terms to the Executive branch.

Plaintiff points to the quotas Congress enacted on timepieces imported from insular possessions, apparently to argue that Congress has reserved for itself authority to enact quotas on merchandise which met the rule of origin stated in General Headnote 3(a). But the fact that Congress has enacted quotas with respect to one kind of merchandise hardly argues that it has not delegated to executive branch authority to adopt other country of origin rules for non duty purposes.

## B. 19 C.F.R. § 12.130 and the CNMI

Plaintiff and *amicus curiae* argue at length that Customs had no authority to exclude products imported from the CNMI under 19 C.F.R. § 12.130 since (1) the source of executive power to regulate textile imports is section 204 of the Agricultural Act of 1956, as amended, 7 U.S.C. § 1854 (1982),[9] (2) that statute grants the President authority to issue regulations governing importation of products of

---

7. Congress also amended General Headnote 3(a) in 1974 and 1983 to implement the Generalized System of Preferences and the Carribean Basin Initiative, respectively. The Trade Act of 1974, Pub.L. 98–618, 88 Stat.1978, § 502; Caribbean Basin Economic Recovery Act, Pub.L. 98–67, 97 Stat. 392, § 214(a)(1)(B). Both enactments altered the foreign content permissible with respect to duty-free entry of goods from insular possessions. Neither enactment is accompanied by any indication that Congress created or approved any particular administrative test for "product" of an insular possession.

8. *Amicus curiae* argues that General Headnote 3(a) establishes a single "value added" test, referring to legislative history of the Tariff Act of 1909, Ch. 6, 35 Stat. 11, § 5 (1909), and the Tariff Act of 1930, Ch. 497, 46 Stat. 590, § 301 (1930), which provided for duty-free treatment for imports from the Philippine Islands.

The two-prong test was established in the Customs Simplification Act of 1954, the first legislation to permit duty-free entry of imports from the CNMI. As Customs Ruling CLA–2 CO:R:CV:G 553239·PR, issued to plaintiff after promulgation of 19 C.F.R. § 12.130, recognizes, Customs had an established and uniform practice of defining "products" of insular possessions, a requirement that was additional to the value added test. In a previous ruling, Customs described that practice as follows:

Whether an article is a "product" of an insular possession within the meaning of General Headnote 3(a), TSUS, depends upon whether substantial processing operations are performed in the insular possession. Customs has consistently ruled that Headnote 3(a) requires more than merely "some processing." Articles imported into the insular possession must undergo extensive operations to satisfy the requirement that the merchandise be the growth or production of the possession.

On August 2, 1985 Customs proposed a change in this established and uniform practice in order to conform the definition of product under General Headnote 3(a) with the country of origin rule of section 12.130(b). 50 Fed.Reg. 3193.

9. Section 204 states in part:

The President may, whenever he determines such action appropriate, negotiate with representatives of *foreign governments* in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any agricultural commodity or product manufactured therefrom or textiles or textile products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles, or textile products to carry out any such agreement. *In addition, if a multilateral agreement has been or shall be concluded under the authority of this section among countries accounting for a significant part of world trade in the articles with respect to which the agreement was concluded, the President may also issue, in order to carry out such an agreement, regulations governing the entry or withdrawal from warehouse of the same articles which are the products of countries not parties to the agreement* [emphasis added].

"countries", and (3) the CNMI is not a country, but an insular possession in commonwealth status with the United States.[10]

■ But, plaintiff's merchandise was excluded because it was determined to be a product of *Korea*, not the CNMI. The President has been delegated broad authority under section 204 to negotiate textile restraint agreements with other nations, and to order the promulgation of regulations to carry out such agreements. *See American Association of Exporters and Importers—Textile and Apparel Group v. United States*, 751 F.2d 1239 (Fed.Cir. 1985). Pursuant to this authority, the United States entered into an agreement with Korea limiting imports of textile products from that country into the United States, and the President ordered 19 C.F.R. § 12.130 promulgated to prevent the circumvention and frustration of such agreements. *See* Exec. Order No. 12475, 49 Fed.Reg. 19955 (May 11, 1984). Plaintiff does not question the President's authority to negotiate such an agreement with Korea, or to order the promulgation of section 12.130 to carry out such agreements. *See Mast Industries, Inc. v. Regan*, 8 CIT ——, 596 F.Supp. 1567 (1984); *American Association of Exporters and Importers—Tex-*

*tile and Apparel Group v. United States*, 751 F.2d 1239 (Fed.Cir.1985).

Plaintiff contends that Congress has limited its delegation of authority to the President under section 204 to define products of "countries" for textile restraint purposes to excluding from such restraints products subject to duty-free treatment under General Headnote 3(a). But the Court finds nothing in the legislative history of General Headnote 3(a) or section 204 which requires such an interpretation of these statutes. General Headnote 3(a) provides only for duty-free treatment for products of insular possessions. It is not impermissible for section 12.130(b), defining products for purposes of quantitative restraints on textiles, to affect products imported from insular possessions.

■ In effect, the country of origin of the merchandise was Korea for textile restraint purposes, and may have been the CNMI for duty and marking purposes.[11] This situation may be awkward, but there is no violation of General Headnote 3(a).

## II. The Declaratory Judgment

Plaintiff asks for a declaratory judgment in several paragraphs in its complaint.[12]

10. Since 1947 the United States has administered the Northern Mariana Islands as part of the Trust Territory of the Pacific Islands under a United Nations Trusteeship Agreement. Trusteeship Agreement for the Former Japanese Mandated Islands, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189. Under the Trusteeship Agreement, Art. 3, the United States, as Administering Authority has:

full powers of administration, legislation, and jurisdiction over the Territory subject to the provisions of this Agreement, and may apply to the Trust Territory, subject to any modifications which the Administering Authority may consider desirable, such of the laws of the United States as it may deem appropriate to local conditions and requirements.

Article 8, § 4, of the Trusteeship Agreement gave the United States power to negotiate and conclude treaties and agreements with other nations on behalf of the CNMI.

The Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States, Pub.L. 94–241, 90 Stat. 263, (1976) printed at 48 U.S.C. § 1681, note (1982), was approved by act of Congress on

March 24, 1976. Article 1, section 101 of the Covenant, provides: "The Northern Mariana Islands upon termination of the Trusteeship Agreement will become a self-governing commonwealth to be known as the 'Commonwealth of the Northern Mariana Islands', in political union with and under the sovereignty of the United States of America."

11. Since the merchandise was not entered, it was not assessed a rate of duty.

12. Plaintiff's complaint does not set forth separate causes of action. Plaintiff requests declaratory relief in the following numbered paragraphs:

14. .... Plaintiff seeks a declaratory judgment that 19 CFR § 12.130, as applied to the imported merchandise and to future importations of textile articles from the Commonwealth of the Northern Mariana Islands, is an *ultra vires* Executive Act, contrary to statute, and void.

27. By Notice published at 50 Fed.Reg. 8650–51, March 4, 1985, the Chairman of the Committee for the Implementation of Textile

Plaintiff seems to request that the Court declare *ultra vires* and void (1) section 12.130(b) on its face and as applied (a) to plaintiff's merchandise; (b) to future shipments of plaintiff's merchandise; and (c) to "textile articles from" the CNMI; and (2) the notice of the Chairman of the Committee for the Implementation of Textile Agreements, limiting to 70,000 dozen the number of sweaters that may be imported from the CNMI without application of section 12.130 during the period November 1, 1984 to October 31, 1985.

Plaintiff seeks relief under the Declaratory Judgment Act, 28 U.S.C. § 2201 (1982).[13] The Customs Court Act of 1980, § 301, 28 U.S.C. § 2643(c)(1) (1982), creating the Court of International Trade, specifically granted the Court authority to "order any ... form of relief that is appropriate in a civil action, including ... declaratory judgments."[14] Although the Court has

considered its jurisdiction to issue declaratory judgments under 28 U.S.C. § 1581(h) (1982),[15] *see 718 Fifth Avenue Corp. v. United States*, 7 CIT —— (Slip Op. 84–39), apparently there has been no judicial opinion discussing the Court's authority to issue declaratory judgments under 28 U.S.C. § 2643(c)(1) or 28 U.S.C. § 2201.

Analyzing the Declaratory Judgment Act, the Supreme Court has been clear that "[t]he requirements for a justiciable case or controversy are no less strict in a declaratory judgment proceeding than in any other type of suit.... This court is without power to give advisory opinions.... It has long been its considered practice not to decide abstract, hypothetical or contingent questions." *Alabama Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). The

---

Agreements, purports to permit a quantity of sweaters, not to exceed 70,000 dozen during the period November 1, 1984 through October 31, 1985, to enter the United States without application of 19 CFR 12.130, upon certification of the Government of the Commonwealth of the Northern Mariana Islands, pursuant to section 204, Agricultural Act of 1956, as amended. The provision is termed an "arrangement" and not an agreement.

28. Any arrangement or agreement propounded by the Executive Departments of the United States and the Commonwealth of the Northern Mariana Islands cannot be premised upon section 204, Agricultural Act of 1956, as amended, 7 U.S.C. 1854. Any such arrangement or agreement does not conform to said section and exceeds the power delegated thereby to the Executive by the Congress of the United States. Judgment is sought declaring the law in the premises.

37. 19 CFR 12.130 in so far as it purports to limit the importation of products of the Northern Mariana Islands by criteria not enunciated by the Congress of the United States in General Headnote 3(a), TSUS, in the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States, and in the legislation passed by the Congress of the United States in furtherance thereof, is a regulation beyond the power of the Executive to adopt. Judgment is sought declaring any such criteria contrary to law and void.

42. The determination of the country of origin of the imported merchandise upon the basis of 19 CFR 12.130 is contrary to law,

since 19 CFR 12.130 is without statutory basis as applied to the insular possessions of the United States, and particularly to the Commonwealth of the Northern Mariana Islands. Judgment is sought declaring said regulation, as amended, adopted, and published on March 5, 1985 at 50 Fed.Reg. 8723–25, contrary to law and unenforceable in these respects.

13. 28 U.S.C. § 2201 (1982) provides that "[i]n the case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration...."

14. The Customs Court lacked power to grant equitable relief, and declaratory judgments sound in equity. *Alberta Gas Chemicals, Inc. v. Blumenthal*, 82 Cust.Ct. 77, 88, C.D. 4792, 467 F.Supp. 1245, 1254 (1979).

15. 19 U.S.C. § 1581(h) provides that the Court shall have exclusive jurisdiction of any civil action commenced to review, prior to the importation of the goods involved, a ruling issued by the Secretary of the Treasury, or a refusal to issue or change such a ruling, relating to classification, valuation, rate of duty, marking, restricted merchandise, entry requirements, drawbacks, vessel repairs, or similar matters, but only if the party commencing the civil action demonstrates to the court that he would be irreparably harmed unless given an opportunity to obtain judicial review prior to such importation.

Court therefore will examine each issue with respect to which plaintiff requests declaratory judgment to determine whether it presents "a real, substantial controversy between parties having adverse legal interests, [and is] a dispute definite and concrete, not hypothetical or abstract." *Babbit v. United Farm Workers National Union*, 442 U.S. 289, 298, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979).

Plaintiff concedes that section 12.130(b) validly regulates products of "countries". The Court has decided that plaintiff's merchandise was lawfully excluded pursuant to section 12.130(b) as a product of Korea. *See* pages 4–15, *supra.* Thus the Court has already held section 12.130(b) valid as applied to plaintiff's merchandise, and, by extension, future shipments of similar merchandise.

▮ Plaintiff also challenges reference in section 12.130(b) to "products ... of insular possessions" and application of the regulation to "products" of the CNMI.

An action under 28 U.S.C. § 1581(i) may be brought "by any person adversely affected or aggrieved by agency action within the meaning of section 702 of title 5." 28 U.S.C. § 2631(i) (1982). But plaintiff has not alleged that it is adversely affected or aggrieved by the regulation of products of insular possessions, since plaintiff's merchandise is a product of Korea and not the product of an insular possession. The Court may not issue a declaratory judgment "advising what the law would be on a hypothetical state of facts." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

▮ Plaintiff also lacks standing, on the present record, to challenge the directive of the Chairman of the Committee for the Implementation of Textile Agreements (CITA) to Customs, which permits 70,000 dozen sweaters to be imported from the CNMI without application of section 12.130 during the period November 1, 1984 to October 31, 1985.[16] Nothing in plaintiff's complaint, or in its briefs on the pending motions, alleged any facts to indicate that plaintiff was or would be adversely affected or aggrieved by the CITA directive.[17]

The Court holds that section 12.130(b) is valid as applied to plaintiff's merchandise, and that plaintiff lacks standing to claim that the regulation is invalid as applied to products of the CNMI or to challenge the CITA directive excepting 70,000 dozen sweaters imported from the CNMI.

### III.  Conclusion

The Court holds that General Headnote 3(a) of the TSUS regulates only duty paid on imports from insular possessions and does not define the country of origin of merchandise imported from insular possessions for all purposes; that plaintiff's merchandise was lawfully excluded pursuant to section 12.130(b) as a product of Korea; and that plaintiff lacks standing to challenge (1) section 12.130 as applied to products of insular possessions and (2) the CITA directive.

Defendant's motion for summary judgment is granted.  So ordered.

16. Plaintiff challenges the directive on two grounds.  First, it says that the Executive, and his delegee CITA, have no authority under section 204, or any other law, to impose quotas on goods imported from insular possessions.  Second, plaintiff says that under the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States, imports from the CNMI are "subject to the same treatment as imports from Guam", article 603(c), and that since the number of sweaters that may be imported from Guam without application of section 12.130 during the period is 160,000, the directive limiting CNMI imports is contrary to law.

17. The Court could consider a motion under Rule 59 of the Rules of this Court if plaintiff shows it is adversely affected or aggrieved by the CITA directive.