**TARGET SPORTSWEAR, INC.,**
**Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 95–1212.**

United States Court of Appeals,
Federal Circuit.

Nov. 17, 1995.

Bernard J. Babb, Wasserman, Schneider & Babb, New York City, argued, for plaintiff-appellant. With him on the brief, was David M. Steiner.

Rhonda K. Schmare, Attorney, Commercial Litigation Branch, Department of Justice, Washington, D.C., argued, for defendant-appellee. With her on the brief, were Frank W. Hunger, Assistant Attorney General, and David M. Cohen, Director.

Before LOURIE, Circuit Judge, COWEN, Senior Circuit Judge, and SCHALL, Circuit Judge.

COWEN, Senior Circuit Judge.

Appellant, Target Sportswear, Inc. (Target), appeals the decision of the United States Court of International Trade granting summary judgment for the United States and dismissing Target's challenge to an interim regulation promulgated by the United States Customs Service, Department of the Treasury (Customs). *Target Sportswear,*

*Inc. v. United States,* 875 F.Supp. 835 (Ct. Int'l Trade 1995). We affirm.

## BACKGROUND

Target, through its affiliate Altan, Inc., imports suits from the United States Virgin Islands (U.S. Virgin Islands) into the United States. The U.S. Virgin Islands is an insular possession of the United States. 48 U.S.C. § 1392 *et seq.* (1994).

On December 9, 1993, Customs refused to allow entry of twelve mens suits shipped by Target from the U.S. Virgin Islands because the suits were not accompanied by a textile export visa from the Dominican Republic. Customs required an export visa because an interim regulation classified the suits as products of the Dominican Republic, as opposed to products of the U.S. Virgin Islands, for purposes of a quota restriction on Dominican Republic textiles. *See* 19 C.F.R. § 12.130(c)(2) (interim regulation). Customs promulgated the interim regulation pursuant to section 204 of the Agriculture Act of 1956.[1] 7 U.S.C. § 1854 (1994) (§ 204). Section 204 delegates to the President the power to enter into trade agreements that limit the import of textiles or textile products from foreign countries and the power to promulgate regulations that implement such agreements.[2] Pursuant to § 204 and the multinational Multi–Fiber Arrangement Regarding International Trade in Textiles, the United States and the Dominican Republic entered into a bilateral agreement that established the quota restriction applied to Target's suits.

Target contends that the suits were improperly denied entry, because the interim regulation exceeds the scope of the President's authority under § 204. The suits were produced by cutting unmarked fabric, lining and interlining into garment pieces in the U.S. Virgin Islands. The cut pieces were joined to form components, where appropriate, and then were shipped to the Dominican

Republic. In the Dominican Republic, the components were sewn together. The garments were returned to the Virgin Islands for finishing, and were then shipped to the United States for import.

It is undisputed that the suits underwent their "last substantial transformation," which is an established test in customs law for determining the country of origin of a product that was processed in multiple locales, in the U.S. Virgin Islands. The challenged interim regulation, however, provides that textile products exported from an insular possession that were "advanced in value, improved in condition, or assembled" in a foreign country cannot be treated as a product of the insular possession. 19 C.F.R. § 12.130(c)(2) (1995). Under the interim regulation, it is undisputed that the suits at issue are treated as a product of the Dominican Republic for purposes of the quota imposed by the bilateral agreement, notwithstanding the fact that the suits underwent their last substantial transformation in the U.S. Virgin Islands.

## DISCUSSION

In arguing that the interim regulation is *ultra vires,* Target posits that § 204's delegation of authority does not grant the President the power to formulate a country of origin rule for § 204 agreements, other than the established substantial transformation test. As indicated, *supra,* the substantial transformation test is recognized and well-established in cases involving country of origin determinations. *See Ferrostaal Metals Corp. v. United States,* 664 F.Supp. 535, 537–38 (Ct. Int'l Trade 1987) (relying on substantial transformation precedent to determine if Japanese steel processed in New Zealand was subject to a bilateral agreement that provided a quota on Japanese steel); *see also Anheuser–Busch Brewing Ass'n v. United States,* 207 U.S. 556, 562, 28 S.Ct. 204, 206,

---

**1.** At the recommendation of the Committee for the Implementation of Textile Agreements ("CITA"), Customs enacted the interim regulation under the authority of the President. In this case, there is *no issue concerning the intra-executive branch delegation of authority* from the President to CITA and Customs.

**2.** The Constitution provides that "Congress shall have Power . . . To regulate Commerce with foreign Nations. . . ." U.S. Const. art. I, § 8, cl. 3. This power may be delegated to the Executive. *California Bankers Ass'n. v. Shultz,* 416 U.S. 21, 59, 94 S.Ct. 1494, 1516, 39 L.Ed.2d 812 (1974).

52 L.Ed. 336 (1908). Target also makes the related argument that because the U.S. Virgin Islands is not a foreign country, the President lacks the power to enact a regulation that changes the country of origin for goods that, prior to the regulation, would have been products of an insular possession.

■ The Court of International Trade held that § 204's delegation of authority encompassed the power to depart from the substantial transformation test for determining the country of origin of goods subject to a § 204 agreement. The court further held that the suits were properly excluded on the basis of the interim regulation. We review the court's interpretation of the relevant statutes and regulations *de novo*. *St. Paul Fire & Marine Ins. Co. v. United States,* 6 F.3d 763, 767 (Fed.Cir.1993).

## I.

Section 204 provides, in relevant part:

The President may, whenever he determines such action appropriate, negotiate with representatives of foreign governments in an effort to obtain agreements limiting the export from such countries and the importation into the United States of any agricultural commodity or product manufactured therefrom or textiles or textiles products, and the President is authorized to issue regulations governing the entry or withdrawal from warehouse of any such commodity, product, textiles, or textile products to carry out any such agreement.

By its terms, the statute authorizes the President to negotiate agreements that limit textile imports and to promulgate regulations that implement § 204 agreements.

On May 9, 1984, the President issued an executive order directing the Secretary of the Treasury, in consultation with CITA, to issue regulations covering textiles and textile products subject to § 204. Executive Order No. 12475, 49 Fed.Reg. 19,955 (May 9, 1984). The executive order expressly directed the Secretary, to the extent necessary, to make "clarifications in, or revisions to, the country of origin rules ... in order to avoid circumvention of ... bilateral textile agreements."

*Id.* Accordingly, Customs issued interim regulations providing rules of origin for textiles and apparel, 49 Fed.Reg. 31,248 (Aug. 3, 1984), which were finalized in 1985, 50 Fed. Reg. 8710 (March 5, 1985). These regulations are codified at 19 C.F.R. 12.130 (1995). Paragraph (b) of the regulations provides that textiles and textile products manufactured or processed in more than one locale shall be a product of the place where "it last underwent a substantial transformation," except as provided in paragraph (c). 19 C.F.R. § 12.130(b) (1995).

Although the § 204 regulations adopted the last substantial transformation test, the Secretary also promulgated an exception to the test in paragraph (c) of the regulations, 19 C.F.R. § 12.130(c) (1986), now codified at 19 C.F.R. § 12.130(c)(1) (1995). Paragraph (c)(1) provides that textiles or textile products of the United States which are returned to the United States after having been advanced in value, improved in condition or assembled abroad cannot be considered products of the United States upon their return. 19 C.F.R. § 12.130(c)(1) (1995).

On April 14, 1993, the Customs Service published the interim regulation at issue, which added paragraph (c)(2). 58 Fed.Reg. 19,347 (1993); 19 C.F.R. 12.130(c)(2) (1995). Consistent with paragraph (c)(1), paragraph (c)(2) provides

[u]nless otherwise required by law, the rules of origin applicable to products of the U.S. shall also apply to products of insular possessions of the U.S. Accordingly, notwithstanding paragraph (b) of this section, for purposes of section 204 ... products of insular possessions of the U.S., if imported into the U.S. after having been advanced in value, improved in condition, or assembled, outside the insular possessions shall not be treated as products of those insular possessions.

Prior to the interim regulation, a garment that was cut in an insular possession and then assembled in a foreign country could be shielded from textile quota restrictions covering that foreign country, because the garment could be classified as a product of the insular possession under the existing standards. *See* 58 Fed.Reg. 19,347, 19,348 (April

14, 1993). By providing for similar treatment of all textile products that are sent abroad for further processing, whether they are sent from the United States or an insular possession, the interim regulation addressed the concern that textile import restrictions were being circumvented by manufacturers in insular possessions who sent garment pieces to foreign countries for assembly while enjoying "more favorable quota and visa treatment than textile and textile products produced in the United States." *Id.*

## II.

Target does not dispute the fact that the interim regulation was aimed at eliminating the potential advantage enjoyed by garment cutting operations located in insular possessions. Rather, Target asserts that the regulation exceeds the authority delegated to the President in § 204. We disagree.

The grant of authority to the President under § 204 is broad. *American Ass'n. of Exporters and Importers–Textile and Apparel Group v. United States,* 751 F.2d 1239, 1247 (Fed.Cir.1985) (*AAEI–TAG*); *Mast Indus., Inc. v. Regan,* 8 C.I.T. 214, 596 F.Supp. 1567, 1575 (1984) (recognizing § 204's broad delegation). Section 204 "imposes no restrictions on the President's administration of the textile trade program. There are no procedural requirements nor limitations.... All that is needed is that the President's action be relevant to the enforcement of some existing textile agreement." *AAEI–TAG,* 751 F.2d at 1247. Although *AAEI–TAG* specifically addressed the imposition of import restrictions on textiles under § 204, it clearly establishes that the President has broad discretion under § 204.

The President's power under § 204 is further augmented by his constitutional power in the international arena: "legislation conferring upon the President discretion to regulate foreign commerce invokes, and is reinforced and augmented by, the President's constitutional power to oversee the political side of foreign affairs." *AAEI–TAG,* 751 F.2d at 1248; *see Florsheim Shoe Co. v. United States,* 744 F.2d 787, 793 (Fed.Cir. 1984) (citations omitted) (counselling against narrow constructions of Congressional authorization in the foreign affairs area).

■ As the trial court correctly held, the interim regulation is relevant to the enforcement of the bilateral agreements implementing the textile program, such as the textile agreement with the Dominican Republic. The interim regulation directly affects whether an imported good must be charged against a particular country's quota. As it defines what goods the United States believes are subject to § 204 quotas, the interim regulation serves to "carry out" § 204 bilateral agreements.

Nevertheless, Target essentially argues that § 204 only grants authority to regulate the products and exports of foreign countries. Because the substantial transformation test predated the enactment of § 204, Target reasons that the regulations cannot reach products that last underwent a substantial transformation in an insular possession rather than a foreign country. Congress, however, has the power to legislate country of origin rules. Section 204 is a broad delegation of Congress' foreign commerce power, and by its terms, the delegation includes legislative power to promulgate rules relevant to § 204 agreements. There is no persuasive evidence, in either the text or the legislative history surrounding § 204, establishing that Congress intended to grant the President this broad authority, but at the same time to withhold from him the power to promulgate, when appropriate, a country of origin rule that differs from the customary test.

In addition, the interim regulation does not improperly impact insular possessions. The goods covered by the regulation must have been advanced in value or similarly processed in a foreign country. This nexus between the product and a foreign country brings the interim regulation squarely within the scope of the statute.

Target also argues that the interim regulation violates the longstanding principle in customs law that goods should have one country of origin for all purposes. Target notes that under the interim regulation, a textile product might have one place of origin for quota purposes and another place of ori-

gin for duty and marking purposes. It is recognized, however, that a § 204 regulation may cause a product to have one country of origin for quota purposes and a different origin for other trade purposes. *Yuri Fashions Co. v. United States,* 10 C.I.T. 189, 632 F.Supp. 41, 46 (1986), *aff'd* 804 F.2d 1246 (Fed.Cir.1986) (adopting the trial court's opinion), *cert. denied,* 481 U.S. 1004, 107 S.Ct. 1625, 95 L.Ed.2d 199 (1987). The practice of assigning only one country of origin is not a substantive limitation on the broad delegation of foreign commerce power to the President pursuant to § 204.

Lastly, Target maintains that § 204 must be construed as prohibiting the interim regulation because if allowed to stand, the regulation violates the bilateral agreement between the United States and the Dominican Republic. In *AAEI–TAG,* however, we recognized that § 204 is a broad delegation of authority, bolstered by the President's constitutional power. 751 F.2d at 1245–47. Therefore, we do not discern any reason to adopt Target's narrow construction of the statute.

### III.

### *Conclusion*

For the reasons stated above, the decision of the United States Court of International Trade is affirmed.

*AFFIRMED.*